## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DEVIN W.[1]

       Plaintiff,

   v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

Case No. 2:23-cv-962

Marbley, J.
Bowman, M.J.

### REPORT AND RECOMMENDATION

Plaintiff Devin W. filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Plaintiff presents a single claim of error. For the reasons explained below, the ALJ's finding of non-disability should be REVERSED and REMANDED for further development of the record.

### I.  Summary of Administrative Record

On August 12, 2019, Plaintiff filed an application for Title II Child Disability Insurance Benefits ("DIB") alleging a disability solely based on mental impairments beginning June 1, 2017. (Tr. 169). After his application for benefits was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an Administrative Law Judge ("ALJ"). At a hearing held on March 3, 2022, Plaintiff appeared telephonically with counsel and gave testimony before ALJ Noceeba Southern; a vocational expert also testified. (Tr. 32-50). On March 22, 2022, the ALJ issued an

---

[1]Due to significant privacy concerns in social security cases, the Court refers to claimants only by their first names and last initials. *See* General Order 22-01.

1

adverse written decision. (Tr. 12-30). The Appeals Council denied further review, and the ALJ's decision became the final decision of the Commissioner. Plaintiff then filed this judicial appeal.

Plaintiff is single and lives in a house with his mother, along with ten dogs. (Tr. 20; Tr. 405).[2] He was 16 years old on the date of his alleged onset of disability, which is considered a "younger individual." He remained in the same age category, at 21 years old, on the date of the ALJ's decision. (Tr. 20). Although he was still in high school on his alleged onset date, he graduated high school at 19, more than two years before the date of his hearing. Plaintiff does not have a driver's license because he is too nervous to drive. (*Id.*)

The ALJ determined that Plaintiff has the following severe impairments: "generalized anxiety disorder with agoraphobia; obsessive compulsive disorder ("OCD"); attention deficit hyperactivity disorder ("ADHD"); a depressive disorder; and post-traumatic stress disorder ("PTSD"). (Tr. 17). None of Plaintiff's impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (*See* Tr. 19).

Considering all of Plaintiff's impairments, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> simple, routine tasks (those learned by brief demonstration, for up to 30 days); few detailed instructions; occasional changes and occasional decision making in a static work environment; any changes must be well explained; supervisory support during changeover; occasional but

---

[2]While there are multiple references to the dogs in the record, the ALJ did not question Plaintiff about the family pets at the hearing.

superficial contact with coworkers and supervisors ("superficial" is defined as any contact beyond that which is necessary to perform job duties and job functions and that does not require the use of negotiation, mediation, problem solving, or conflict resolution skills); no contact with the public; must avoid tandem work; and no fast pace or strict production quotas.

(Tr. 19-20).

Based upon the RFC as determined and testimony from a vocational expert, the ALJ held that Plaintiff could still perform a substantial number of unskilled jobs existing in the national economy, including the representative positions of laundry worker and dishwasher kitchen helper. (Tr. 25). Therefore, the ALJ determined that Plaintiff was not under a disability. (*Id.*)

In this judicial appeal, Plaintiff asserts error in the ALJ's evaluation of a treating source opinion. The undersigned agrees that the ALJ committed reversible error and that the decision as a whole is not supported by substantial evidence.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits under the Social Security Act, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted); *see also Biestek v. Com'r of Soc. Sec.*, 139 S. Ct. 1148, 1154 (2019) (explaining that "the threshold for such evidentiary sufficiency is not high.")

In considering an application for child's insurance benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A). In addition, a plaintiff who seeks child's insurance benefits must prove that his disability began before he reached the age of 22. 20 C.F.R. § 404.250(a)(5).

**B. Plaintiff's Claim of Error**

Plaintiff alleges that the ALJ failed to properly evaluate the supportability and consistency of the medical opinions of his treating Nurse Practitioner. For context, the undersigned first summarizes all relevant mental health evidence.

**1. Relevant Mental Health Evidence**

**a. Educational Records and Statements to Agency**

Plaintiff's father died in motorcycle accident when Plaintiff was 5 years old. He was held back in first grade due to his father's death. (Tr. 699). Plaintiff's mother removed him from seventh grade in traditional school in 2015 after he was suspended due to bullying and behavioral issues. She enrolled him in an online school that he attended from home. (Tr. 300, 667, 673). Plaintiff had a 504 plan but was enrolled in mainstream classes in his virtual school. Plaintiff attended the Electronic Classroom of Tomorrow through the eleventh grade until that school closed in January 2018. Sometime after that,[3] he enrolled in the Ohio Virtual Academy. (Tr. 301).

---

[3]There is a reference in the record to Plaintiff having taken the spring semester of 2018 off from school to focus on counseling. (Tr. 62).

In January 2019 during his senior year of high school, Plaintiff's mother requested additional accommodations for Plaintiff due to his perceived difficulty in passing sufficient classes to graduate. Plaintiff was evaluated and provided with increased accommodations. However, the school determined that no formal IQ or other diagnostic testing was necessary and should be avoided due to Plaintiff's testing anxiety. (Tr. 300; *see also* Tr. 322 (stating eligibility for special education services); Tr. 278 (noting eligibility for services as a 12th grader, based on evaluation completed 3/12/19); Tr. 271 (recommending services through anticipated graduation following completion of summer school).

In his Individualized Education Program ("IEP"),[4] Plaintiff was excused from all End of Course tests. (Tr. 276-277, 279). The exemption from testing was based in part on the report that "Devin gets physically sick when he has to leave [his home] for testing," and the fact that his mental health diagnoses along with Xanax prescribed for test days may negatively impact his performance. (Tr. 279). Devin tested below the "proficient" level in all subjects on Ohio State Tests in April 2016, April 2017 and December 2017. (*Id.*) As part of his accommodations, Devin received small group instruction, extended time up to 1.5x, frequent breaks, redirection, clarifying instructions and cueing, and a 25% total reduction in coursework. (Tr. 280, 286-287, 289-295). He also was provided with and benefitted from daily one-on-one sessions with his teachers. (Tr. 279).

Plaintiff graduated from high school sometime in 2019 at the age of 19. (*See* Tr. 56, 9/16/19 report that Plaintiff "has not graduated yet"). During his senior year, Plaintiff

---

[4]There are references to both a 504 plan and an IEP in the record. However, the Ohio Virtual Academy document setting forth additional accommodations is specifically identified as an IEP signed on May 23, 2019. (*See* Tr. 276-294).

reported playing video games in his free time, and aspired to someday be able to "go to the movies and get out with friends." (Tr. 280). His transition goal was to find "a job that will allow him to work from home." (Tr. 282). However, at the time of his transition plan interview on March 1, 2019, Plaintiff had never completed any job applications or participated in any interviews. (*Id.*) He seldom left his house, and reported that he was unable to travel independently or communicate effectively. (Tr. 284).

Plaintiff's records reflect longstanding mental health treatment and increasing isolation between the alleged onset date and the date of the ALJ's decision. During a telephone interview with the agency on September 6, 2019, Plaintiff reported that he "does not [like] to go outside, does not like to see people, only likes to stay in room," to "sleep." (Tr. 57). In the same interview, Plaintiff reported he watches TV and plays video games online but "will not socialize in person with anyone." (*Id.*) At times, Plaintiff does laundry, takes the dogs out, will cook microwaveable meals, and will occasionally cook on the stove. He does not do errands or grocery shopping. (Tr. 57).

### b. Mental Health Treatment Records 2017-2022

Plaintiff was prescribed medication (Vyvanse) by his pediatrician for ADHD, which was deemed effective. He subsequently was prescribed antidepressant medication beginning in 2017. However, he did not like Zoloft and Lexapro was ineffective. (Tr. 648). He sometimes refused to take anti-depressant medication due to side effects. (Tr. 693).

Plaintiff was referred to Directions for Youth for both medication management and counseling on February 7, 2018, at which time his mother reported he had been "reclusive, mouthy, and irritable since 2013," sleeping throughout the day, socially isolated, eating in his room and generally withdrawn. (Tr. 702). He was diagnosed with ADHD; persistent depressive disorder, early onset, with intermittent major depressive

episodes; parental overprotection; and loss of love relationship in childhood. (Tr. 695-696). Plaintiff was resistant to counseling. (Tr. 693). He was apathetic, withdrawn, passive, uncooperative, with flat affect, but normal intellect and thought content. (Tr. 700).

On February 20, 2018, Mike Cardillo MSW, LISW developed an individual service plan that included strategies such as self talk statements to increase acceptance, allowing self to feel anxiety or discomfort once per week, doing something outside of the house once per week, or going out with friends once every other week. (Tr. 681-691). Mr. Cardillo noted that Plaintiff's prognosis "is poor as clt is highly resistant to services." (Tr. 684). As predicted, Plaintiff made minimal progress. Plaintiff "identified" self-talk statements but did not use them. He "did not increase social interactions or outside activities" and was discharged from treatment on May 30, 2018 after he refused to leave his house except for doctor appointments. (Tr. 679-680).

After applying for disability on September 17, 2019, Plaintiff reestablished care with Mr. Cardillo. Mr. Cardillo again diagnosed persistent depressive disorder, early onset with intermittent major depressive episodes, without current episode, but added agoraphobia. (Tr. 676). The previous therapy plan was reinstituted. Plaintiff reported that he only leaves home "if I have to," less than once per month on average. (*Id.*) He reported no friends except some acquaintances through online gaming, but enjoyed video games, drawing, listening to music, and swimming in the back yard pool. (Tr. 672). In addition to interacting with his mother, his grandmother would come to visit once every other month. (Tr. 671). Mr. Cardillo assessed Plaintiff's' prognosis as "fair" on the basis that he was at least "somewhat engaged." (Tr. 654).

Plaintiff's therapy sessions were via telehealth due in part to the Covid-19 pandemic. Plaintiff again made minimal progress. On January 30, 2020 and on April 23,

2020,[5] Mr. Cardillo wrote that Plaintiff "has been going out [of the house] once every other week," but "has not spent time with friends in recent months." (Tr. 641; Tr. 633). The notes do not specify the nature of Plaintiff's "going out" – whether for a walk outside the house or to attend appointments. A note dated April 23, 2020 indicates a new "plan [for Plaintiff] to go out to sit outside throughout the week," along with plans "to watch TV and take a hot shower," suggesting that Plaintiff's outside forays were limited. (Tr. 631; *see also*, Tr. 642-643, noting Plaintiff has "identified but not implemented self-talk statements," has "begun limiting snacking").

By September 1, 2020, Mr. Cardillo wrote that Plaintiff "has been going out weekly" and "has been spending time with friend once daily." (Tr. 624). But once again, Mr. Cardillo does not specify whether "going out" means sitting outside (consistent with the April plan) or some other activity, nor does Mr. Cardillo specify whether the interaction with a "friend" was online or in person. By November 24, 2020, Mr. Cardillo recommended that Plaintiff engage in daily stretching and "try to communicate with someone online at least once per week" as well as "do research on something related to his future once per week." (Tr. 612). Progress continued to be minimal. On February 17, 2021, Plaintiff reported stretching and "using one approach for expressing his feelings." (Tr. 604, 606). But he was not communicating online with anyone and had done no "research online in recent months." (Tr. 604, 606). On May 11, 2021, Plaintiff still was not communicating with anyone online. (Tr. 595, 598). It appears that Plaintiff also was not leaving the house since Mr. Cardillo created another new plan for Plaintiff "to spend at least a few minutes out in back yard daily." (Tr. 593).

---

[5]The record contains references to weekly visits with Mr. Cardillo, but the only records from Mr. Cardillo are dated less frequently, approximately quarterly.

9

Plaintiff continued medication management on a monthly basis with Nurse Practitioner Birdsell beginning on January 23, 2020. (Tr. 647). Her records reflect that Plaintiff is afraid to be in a car, "[s]truggles to talk to other people," is afraid of germs, and "[c]annot go out of the house." (Tr. 648). However, aside from persistent issues with depression and anxious mood and constricted affect, with some difficulty with eye contact and facial expressions, other parts of mental status testing were normal, with logical and linear thought process and clear speech. (*Id.*; *see also* Tr. 21 (ALJ discussion)).

Ms. Birdsell prescribed Lexapro on January 23, 2020 but that proved ineffective, as did a trial on Effexor. (Tr. 586). On January 14, 2021, Ms. Birdsell prescribed Pristiq daily for chronic depression and severe anxiety with agoraphobia and panic. (*Id.*) She later added Klonopin for anxiety. On June 10, 2021, Plaintiff reported feeling "better" on Pristiq but had not tried the Klonopin. (Tr. 585, 587). Despite feeling "better," he continued to have trouble with sleep and reported no changes in his ability/desire to leave his house. His mother reported that he was irritable and stayed in his room because he wants to stay away from everyone. (Tr. 585).

On July 15, 2021, Ms. Birdsell noted that Plaintiff reportedly generally refused to leave his room, including to attend appointments, though he did spend time with a family friend outside of the home on one day. (Tr. 797). He declined to participate in appointments by video, limiting contact to the telephone. (*Id.*) On August 3, 2021, he admitted he had no communication with others, even online, "in recent months." (Tr. 791). On November 8, 2021, Plaintiff again reportedly stayed in his darkened room, not leaving his room very often. (Tr. 810). He had "good judgment" overall, but "poor insight" into his agoraphobia. (Tr. 818). On December 27, 2021, for the first time in months, he agreed to

attend his telehealth appointment by video instead of telephone. (Tr. 803-804). However, he still left his house only for limited appointments. (*Id.*)

### c. Agency Psychological Consultative Examination October 2019

Plaintiff was referred to John S. Reece, Psy.D., for an in-person psychological consultative examination on October 21, 2019. (Tr. 571-576). When asked why he was disabled, Plaintiff stated "I don't like to leave the house." (Tr. 571).[6] At the time of his examination, he was not taking any psychotropic medications. (Tr. 572). Dr. Reece described Plaintiff as "passively cooperative" with inconsistent eye contact, minimal facial expressiveness, and a monotone voice. (Tr. 573). Plaintiff's speech was direct, but with minimal output and short utterances, and observed "vagueness." Dr. Reece noted that Plaintiff "often paused before responding," giving an "impression of defensiveness." (*Id.*) His affect was "constricted to flattened," with his mood "mildly anxious and dysphoric." (*Id.*)

Under a summary of daily activities, Dr. Reece wrote that Plaintiff "spends his day doing personal care tasks, doing household tasks, watching TV, and "sleep[s] most of the time." (Tr. 573). The "Daily Activities" summary in Dr. Reece's report further states:

> He reportedly does not participate in any structured social activities, and has no hobbies or interests. Reportedly he and his mother do the cleaning and his mother does the cooking and shopping. *Reportedly he is able to do some cooking and shopping.*

(Tr. 573, emphasis added). The report does not specify what kind of "shopping" Plaintiff reported he is able to do – whether online or in person.

---

[6]Plaintiff was neatly dressed in a hooded sweatshirt and sweatpants, with a "germ mask" worn off his face during the (pre-Covid era) interview.

11

Dr. Reece diagnosed Plaintiff with a depressive disorder and an anxiety disorder. (Tr. 574). However, unlike in most consultative examination reports, Dr. Reece provided little to no assessment or discussion of Plaintiff's limitations. When asked to opine about Plaintiff's limitations in "understanding, remembering, and carrying out instructions," Dr. Reece stated only that Plaintiff "was able to follow directions in the exam," and "reported no work history." (Tr. 575). With respect to maintaining concentration, persistence and pace to perform simple tasks or multi-step tasks, Dr. Reece wrote only that Plaintiff "had no difficulty with concentration *in the exam*." (*Id.*, emphasis added). As for Plaintiff's abilities to respond appropriately to supervision and coworkers in a work setting, Dr. Reece stated only that Plaintiff "reported a history of minimal relationships." (*Id.*) Last, when asked to opine about Plaintiff's limitations in responding to work pressures, Dr. Reece offered the minimal opinion that Plaintiff has "support from his mother," and that "[c]urrent deficits in dealing with stress and pressure in the workplace are depression, anxiety, and emotional instability." (*Id.*)

### d. Non-Examining Agency Psychological Opinions

Two state agency reviewing psychologists offered more relevant mental RFC opinions. On November 22, 2019, Sandra Banks, Ph.D. completed a standard Psychiatric Review Technique Form ("PRTF") in which she listed Plaintiff's anxiety and OCD, depressive, bipolar and related disorders, and neurodevelopmental disorders, without reference to agoraphobia. (Tr. 63). Dr. Banks opined at the initial consideration level that Plaintiff has only mild impairment in understanding, remembering, or applying information, but has moderate impairment in interacting with others, in concentration, persistence or pace, and in adapting or managing oneself. (Tr. 63, assessment of Paragraph B criteria). Although he had received special education services for mood and anxiety issues, she

opined he would not have any understanding or memory limitations. (Tr. 66). She further opined he could carry out simple, repetitive tasks in a setting that did not require multi-tasking or close attention to detail; was capable of maintaining appropriate behavior in a non-public work setting with only occasional interaction with coworkers and supervisors; and could adapt in a setting in which changes were explained in advance. (*Id*.)

Dr. Banks further stated Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, but opined that he was "[n]ot significantly limited" in his ability to "travel in unfamiliar places or use public transportation," or "to set realistic goals or make plans independently of others." (Tr. 67). Yet she acknowledged consistent reports that Plaintiff tends to isolate in his room, does not like to leave the house, and has only one friend with whom he communicates online. (Tr. 67). On reconsideration on July 26, 2021, Karla Delcour, Ph.D. endorsed identical opinions. (Tr. 79-80).

### e. Ms. Birdsell's Opinions

On February 9, 2022, Nurse Practitioner Birdsell completed a medical source statement. The ALJ summarized her opinions as follows:

> In a mental assessment questionnaire prepared by counsel, Ms. Birdsell opined that the claimant would be absent from work more than three times a month due to his mental impairments. She felt he had "extreme" limitation in his ability to maintain regular attendance and be punctual with customary, usually strict, tolerances; sustain an ordinary routine without special supervision; complete a normal workday without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; dealing with normal work stress; dealing with the stress of semiskilled and skilled work; interacting appropriately with the general public; traveling in unfamiliar places; and using public transportation. She opined that he had "marked" limitation in asking simple questions or requesting assistance and accepting instructions and responding appropriately to criticism from supervisors. Finally, she opined that he had "extreme" difficulties in maintaining social functioning; continual episodes of deterioration or decompensation in work settings and "marked" restriction on activities of daily living, though seldom any deficiencies in concentration,

persistence, or pace. She also felt he could manage his own benefits. The undersigned notes that this opinion was made after Ms. Birdsell saw the claimant monthly for over two years.

(Tr. 24, citing Tr. 827-831).

Although the ALJ's summary is accurate as far as it goes, it omits many of Ms. Birdsell's opinions and narrative explanations. For example, Ms. Birdsell confirmed symptoms of sleep disturbance, mood disturbance, panic attacks, anhedonia, psychomotor retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt or flat affect, depressed energy, persistent irrational fears and generalized persistent anxiety. (Tr. 827). Ms. Birdsell also provided the following narrative explanations:

> Devin does not leave the home except to go to a few appointments. He mostly stays in his room with curtains drawn. Despite medication and therapy, he has not improved. He presents with flat affect, decreased energy, lack of intonation in voice.

(*Id*.) She stated that despite weekly counseling and monthly medication review, Plaintiff has had "[v]ery little response to treatment." (Tr. 828). She explained that Plaintiff "is somatic and has many fears of potential illness or injury." (*Id*.)

Ms. Birdsell offered an additional narrative explanation:

> Patient suffers from extreme anxiety. He does not leave his home unless medically necessary. He has reduced stress tolerance and does not like change. He has poor self-esteem and may not ask for help or interact with others. This is due to his anxiety and depressive disorders.

(Tr. 829).

Consistent with the reviewing psychologists, Ms. Birdsell opined that Plaintiff is "not significantly limited" in his abilities to remember, understand and carry out simple or detailed instructions, and "seldom" has limitations in concentration, persistence or pace. (Tr. 830). But to explain the basis for "moderate" limitations in his ability to set realistic

goals or make plans independently of others, and for "extreme" limitations in his abilities to interact with the general public, to travel to an unfamiliar place, or to use public transportation, she wrote:

> Due to his lack of engagement with the outside world, it is difficult to assess his planning and self-efficacy. He has very little stress tolerance. A common occurrence – someone knocking on the door of his home – causes panic and stress. This is due to his anxiety and depressive disorders.
>
> * * *
> Patient does not leave the home and has extreme reactions when anything unexpected happens.

(Tr. 830).

### f. Hearing Testimony

Plaintiff appeared before ALJ Southern by telephone. (Tr. 35). He testified that he did not attend college because he did not like to be around people, and that he did not work because he was too anxious to leave the house. (Tr. 37-38). He had not left the house in more than 30 days. (Tr. 38). He described a good day as being able to stay in his room without being "bugged" by anyone and a bad day as staying in bed in his room due to stress. (Tr. 39-40). He had not visited any friends in person or had friends visit him in the prior year. (Tr. 40). He had not left the house to go shopping with his mother in the past year. (Tr. 41). He would help with laundry but would not take out trash because that involved going outside, which he did not like to do. (Tr. 42).

The ALJ assessed a hypothetical RFC consistent with the RFC included in her written opinion. In response to questioning, the vocational expert testified that there would be jobs that could be performed within those limitations. (Tr. 48). The ALJ then asked the VE to add a limitation that required the individual to work in isolation; the VE testified that the combination of limitations would be work-preclusive. (*Id.*) In response to questioning

by Plaintiff's counsel, the VE also testified that an individual who was off-task for up to 10% of the work day would not be able to work. (Tr. 48-49).

### 2. The ALJ's Errors in Assessing Ms Birdsell's Opinions

Under the regulations applicable to Plaintiff's application, the ALJ was not permitted to defer to or to give any specific evidentiary weight to any prior administrative findings or medical opinions, including those from treating sources. 20 C.F.R. § 416.920c(a). Instead, the ALJ was required to articulate how "persuasive" she found each medical source opinion or prior administrative medical finding, including how she considered the "supportability" and "consistency" of each such opinion or medical finding. *See* 20 C.F.R. § 404.5120c.

The ALJ provided the following analysis of Ms. Birdsell's opinions:

> [N]either the "marked" and "extreme" limitations nor the need for absenteeism identified in this opinion are supported by the broader medical record or the claimant's presentation during the hearing. The undersigned finds this opinion not persuasive. Instead, the claimant's ability to maintain a conversation during the hearing, his apparent ability to finish high school in normal classes, and his presentation during mental status examinations including a capacity to concentrate and orient himself, his fair judgment and insight, and his normal thought content and process all suggest a degree of limitation more consistent with "moderate" than "marked" or "extreme."

(Tr. 24).

Plaintiff claims an articulation error in the ALJ's analysis. In addition, Plaintiff complains that the ALJ's substantive analysis did "not paint an accurate picture of the evidence in the record." (Doc. 8, PageID 878). The undersigned agrees that the ALJ's analysis fails to adequately explain the supportability and consistency factors and mischaracterizes the record. As a result, the decision lacks substantial support in the record as a whole and requires remand.

16

First, the ALJ does not appear to have addressed "supportability" at all. Regarding supportability, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support …her medical opinion(s)…, the more persuasive the medical opinions…will be." 20 C.F.R. § 5\416.920c(c)(1). In her analysis, the ALJ refers to Plaintiff's ability to respond to questions at the telephonic disability hearing, his completion of online high school, and some benign mental exam findings. But that evidence falls under the umbrella of "consistency" - meaning how consistent a medical opinion is with other evidence in the record - rather than "supportability."

The most direct reference to supportability is the ALJ's acknowledgement of the length of treatment relationship. But the ALJ did not discuss *any* of the narrative explanations or other evidence cited by Ms. Birdsell for her opinions, including the objective facts that, despite years of treatment, Plaintiff does not leave the house at all in the average 30-day period, leaves his home with his mother's assistance only for appointments, generally stays in his darkened room with the curtains drawn, has no interpersonal relationships beyond his mother/grandmother, and exhibits a flat affect, decreased energy, and lack of intonation. (Tr. 827). Ms. Birdsell explained the basis for her opinions by referring to Plaintiff's diagnoses and reduced stress tolerance, that he does not like change, and may not be able to ask for help or interact with others due to poor self-esteem. (Tr. 829). She stated that someone knocking on his front door could cause panic and stress, that he reduces stress by not leaving his home, and that he has extreme reactions when anything unexpected happens. (Tr. 830).

The Commissioner points out that the ALJ generally cited to Plaintiff's mental status exams in discounting Ms. Birdsell's opinions, and that four of those mental status

records originated with Ms. Birdsell. (*See*, *e.g.*, Tr. 586 (6/10/21 note); Tr. 783 (8/12/21 note); Tr. 804-805 (12/27/21 note); Tr. 817-818 (10/7/21 note). It is true that the Court must consider the entirety of the ALJ's decision when considering whether an ALJ committed an articulation error. Here, however, the ALJ's cursory reference to mental status exam findings without discussion of Ms. Birdsell's supporting explanations or other supporting objective evidence does not provide an adequate analysis of the "supportability" factor.

For example, the undersigned has considered mental status exam findings regarding Plaintiff's "capacity to concentrate and orient himself, his fair judgment and insight, and his normal thought content and process." (Tr. 24). Those findings are clearly relevant to the assessment of Plaintiff's limitations in concentration, persistence and pace, to his ability to remember, understand and carry out instructions, and to his awareness of normal hazards with the ability to take appropriate precautions. But Ms. Birdsell *agreed* that Plaintiff has few if any limitations in those areas. So in that respect, her opinions are well-supported by her mental status findings. But the ALJ does not explain how Plaintiff's ability to concentrate during a mental status exam is relevant to Ms. Birdsell's opinions that Plaintiff has significant limitations in his abilities to interact with the general public, to travel to an unfamiliar place, or to use public transportation – all hallmarks of his diagnosis of anxiety with agoraphobia with severe depression. Therefore, remand is required based on the failure of the ALJ to explain her evaluation of the supportability of Ms. Birdsell's opinions.

The ALJ offers greater analysis of the "consistency" factor. But the fact that the ALJ better articulated her analysis cannot make up for its substantive flaws. Consistency is defined as the extent to which an opinion or finding is consistent with evidence from

other medical or nonmedical sources. 20 C.F.R. § 416.920c(c)(2). The ALJ begins by stating that Ms. Birdsell's opinions are not supported by "the broader medical record." Yet the ALJ's general statement is unaccompanied by any specific citations. In contrast to the ALJ, the undersigned's review of the "broader medical record" (detailed above) reflects that Plaintiff has essentially no social relationships other than with his mother and grandmother, leaves his home only a few times per year, and primarily spends his time in his room sleeping.

The only evidence cited by the ALJ in the record besides mental status exams was "the claimant's ability to maintain a conversation during the hearing [and] his apparent ability to finish high school in normal classes." (Tr. 24). But Plaintiff's ability to engage in a conversation at a telephonic evidentiary hearing does not mean that he can leave his home to engage in work or interact with the general public. *Contrast Richards v. Comm'r of Soc. Sec*., No. 2:20-cv-5510-ALM-KAJ, 2021 WL 5316761 * 2-3 (S.D. Ohio Nov. 16, 2021) (ALJ noted discrepancy between the agoraphobia reported by provider and record of Plaintiff's community activities and socialization). And the ALJ's reference to Plaintiff's "ability to finish high school in normal classes" is a serious mischaracterization of the accommodations he was provided in order to graduate.

In support of the ALJ's decision, Defendant cites to *Nassar v. Comm'r of Soc. Sec*., No. 22-1293, 2022 WL 17348828 (6th Cir. Dec. 1, 2022), in which the Sixth Circuit held that as long as substantial evidence supports the ALJ's conclusion that a medical opinion was unpersuasive, any arguments supporting other conclusions the ALJ could have made "are a veiled attempt to have [the Court] reweigh the evidence" which this Court may not do. *Id*. at *2. But *Nassar* is distinguishable because the undersigned has concluded that

substantial evidence does not support the ALJ's conclusion that Dr. Birdsell's opinions are unpersuasive.

Last, the Commissioner argues that "substantial evidence supports the ALJ's evaluation" of the reviewing psychologists' opinions on which the ALJ primarily relied as "persuasive." (Doc. 9 at 9, PageID 891). The undersigned disagrees. The ALJ stated (again without specific citation) that the reviewing psychological opinions "are generally supported by the bulk of the objective medical evidence in the record, which shows persistent anxiety and depression issues with a notable reported tendency toward isolation and difficulty leaving the house." (Tr. 23). Contrary to the ALJ's statement, the undersigned concludes that the "bulk of the objective medical evidence" – arguably, the entirety of the objective record - reflects an individual who rarely leaves his darkened room, much less his home. Therefore, the record does not appear to support the reviewing psychologists' opinions that Plaintiff is "not significantly limited" in his abilities to make plans independently of others, or to travel by public transportation to unfamiliar places. Rather, the evidence indicates that Plaintiff avoids all in-person contact, not merely crowds. He seldom leaves his room, and very rarely leaves his house even to walk outside. He does leave his home to be driven by his mother to attend doctor's appointments, but those appointment are less than monthly. Mental health treatment is conducted by telephone, rarely by video, and almost never in person.

One more portion of the ALJ's analysis of the reviewing psychologists merits discussion. The ALJ reasoned:

> [T]reatment efficacy, when compliant… do[es] not support the claimant's reports of symptom frequency and/or severity. Moreover, state agency medical consultants are highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Act. The undersigned finds the mental opinions persuasive, but has adjusted and defined some of the language therein with respect to routine tasks and

> superficial contact, to remain compliant with the Act. The undersigned has also added more severe limitations to no tandem work and to no fast pace or strict production quotas, to address fully the claimant's tendency to isolate and the difficulty with motivation and energy set out in the record and detailed above.

(Tr. 23, emphasis added).

The record reflects that Vyvanse was effective for treatment of Plaintiff's ADHD, and that his mood was briefly improved when his severe acne was treated with isotretinoin. (Tr. 375-376). With ADHD treatment and many accommodations made by his online high school, Plaintiff received his diploma. But there appears to be no evidence that treatment for his depression, anxiety and agoraphobia reduced his symptoms to a level that he left his home or engaged in social relationships. Whether that was by choice or Plaintiff's mental illness is not entirely clear. But Ms. Birdsell opined that Plaintiff has had little response to treatment for non-ADHD related issues. And the record reflects Plaintiff's increasing isolation over the disability period.

In sum, this Court cannot find substantial evidence to support the ALJ's mental RFC limitations. In particular, the ALJ appears to have erred in her assessment of Ms. Birdsell's opinions concerning the severity of Plaintiff's agoraphobia and related conditions, including the assessment of Plaintiff's abilities to leave his home and work in proximity to others.

### III. Conclusion and Recommendation

As discussed, the ALJ based her decision on a flawed assessment of the opinion evidence and record as a whole, without adequate consideration of the objective evidence including Plaintiff's lack of interpersonal relationships, need for significant school accommodations, and consistent failure to leave his room and/or home. At the same time, the record does not support the immediate award of benefits. The record remains unclear

as to whether Plaintiff's limitations are due to intractable mental illness, or (at least in part) to Plaintiff's non-compliance with recommended treatment. Non-compliance with treatment can provide a basis for the denial of benefits, but only if the record is adequately developed. Upon remand, the Commissioner should re-examine the record, reassess all opinion evidence, solicit a new opinion if necessary, and conduct a new evidentiary hearing to further develop the record.

Thus, **IT IS RECOMMENDED THAT the decision be REVERSED** and that this case be remanded consistent with this Recommendation**.**

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DEVIN W.                                              Case No. 2:23-cv-962

             Plaintiff,                               Marbley, J.
                                                      Bowman, M.J.
       v.

COMMISSIONER OF SOCIAL SECURITY,

             Defendant.


**NOTICE**

       Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written

objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of

the filing date of this R&R. That period may be extended further by the Court on timely

motion by either side for an extension of time. All objections shall specify the portion(s) of

the R&R objected to, and shall be accompanied by a memorandum of law in support of

the objections. A party shall respond to an opponent's objections within **FOURTEEN (14)**

**DAYS** after being served with a copy of those objections. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S.

140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

23